# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 9, 2015

## STATE OF TENNESSEE v. AARON REINSBERG

### Appeal from the Criminal Court for Shelby County
### No. 1302058    Chris Craft, Judge
_____

### No. W2014-02436-CCA-R3-CD  -  Filed July 22, 2016
_____

Defendant, Aaron Reinsberg, was convicted by a Shelby County Jury of two counts of rape (Counts 1 and 2), one count of assault (Count 3), and two counts of official misconduct (Counts 4 and 5).  At the sentencing hearing, the trial court merged Counts 2 and 3 into Count 1, and Count 5 was merged into Count 4.  The trial court imposed a sentence of eleven years for rape in Count 1 and one year for official misconduct in Count 4 to be served concurrently for an effective sentence of eleven years.  On appeal, Defendant argues that the evidence was not sufficient to support his rape convictions and that the trial court erred in sentencing him to eleven years.  After a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Aaron Reinsberg.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Facts*

The victim testified that on January 19, 2013, at approximately 10:00 p.m., she drove her friend to Beale Street to celebrate her friend's twenty-first birthday.  While the victim was stopped at a traffic light, she saw Defendant, who was a police officer.  She asked Defendant if Sammie Wicks, another police officer with whom the victim was

friends, was working that night. The victim and Defendant chatted a few moments before the victim drove away.

The victim thought that she and her friend went to Silky O'Sullivan's Pub first, but she was not for certain. The victim was employed as a door monitor at Silky O'Sullivan's. The victim testified that she did not drink much alcohol while out with her friend because she was concerned with taking care of her. The victim testified that her friend later left with her boyfriend, and the victim went out with some of her co-workers from Silky O'Sullivan's, including Mario Olevar, and "enjoyed [her]self." The victim and her co-workers went to the Purple Haze Night Club and Club 152, and the victim had several drinks until she began to feel "really drunk." On the third floor of Club 152, the victim again saw Defendant. They "did an initial side hug and talked[.]" The victim testified that she gave Defendant her phone number because she invited him to meet her and Sammie Wicks later at Alex's Tavern. She did not go to Alex's Tavern because "the alcohol was starting to catch up with [her] and [she] had Mario [Olevar] drive her home." As the victim was leaving the Beale Street area, she received a text message from Defendant asking her whereabouts. The victim told him that she was in the alley, which was where Mr. Olevar's car was parked. She did not recall if she explicitly told Defendant that she was leaving. At that point, she did not invite Defendant to her house. At trial, Mr. Olevar confirmed that the victim had been drinking and that he drove her home at approximately 3:30 a.m. on January 20, 2013. He did not enter the victim's residence.

The victim testified, and phone records confirmed, that Defendant sent the victim a text message at 3:55 a.m. with a "wink face." The purpose of the text was for Defendant to give the victim his phone number. Defendant next sent the victim a text at 3:59 a.m. to see if she was still at Club 152. The victim responded and told Defendant that she was in the alley, and Defendant replied, "[D]on't leave." Defendant again texted the victim stating, "In the alley (sad face)." To which the victim replied, "[H]a ha." The victim testified that she did not ask Defendant to come with her, nor did she ask him for a ride home. Defendant responded, "I'm leaving, too, then. Ha ha." He next texted, "[Y]ou going home?" The victim did not respond.

The victim testified that her roommates, Leah Barnes and Hallie Daniels, and several others were at the house when she arrived home. She changed into more comfortable clothing, and then she and her roommates went into Ms. Barnes' room and talked about their night. The victim could not remember the conversation. Sometime later the victim's boyfriend, Sean Berry, arrived and brought her something to eat. The victim and Mr. Berry got into an argument, and he left. The victim tried to talk him into staying, but he refused and said that they would talk when she was sober. She and Mr. Berry continued to text each other.

2

At some point, Defendant sent the victim a text asking if she was okay, but the victim did not respond. He sent her another text at 4:05 a.m. with a "crying face" symbol to which the victim responded, "TA." The victim testified that she did not know what she meant by that response. At 4:10 a.m., Defendant texted, "Let's hang out," and the victim responded, "Okay." He then asked, "[W]hen, now?" Defendant sent another text, "[D]on't go to sleep." The victim did not respond to either text. At 4:22 a.m., Defendant texted, "LOL," and at 4:27 a.m., the victim responded, "I'm by." She did not know what she meant by that text. Defendant responded, "By what?"

The victim testified that at some point, she texted Mr. Berry and asked him to call her. At 4:31 a.m., she texted Defendant that she was home. Defendant responded, "I've had a crush on you since Sammie introduced me to ya [sic]." He also texted, "Oh, you want me to come over?" The victim responded, "[H]a ha, later." She testified that she intended to dismiss Defendant. The victim received a call from Mr. Berry, and they spoke for just over one minute.

Defendant texted the victim again at 4:33 a.m. and said, "You saying bye?" with a "crying face" symbol. At 4:35 a.m., the victim sent a text message saying, "I hate you." She did not know to whom the message was sent. Defendant texted the victim at 4:35 a.m. and said, "Night darling." The victim responded, "Hagan nah." She did not know what the text message meant. The victim testified that during this time, she accidently texted Defendant to "come here." She intended to send the text message to Mr. Berry because she wanted Mr. Berry to come back to her house. Defendant responded to the text by asking where she lived. The victim told Defendant that she lived in "Cooper Young." She did not provide him with her address. Defendant then attempted to call the victim, but she did not answer.

Defendant next texted the victim and said, "[L]et's hang out." The victim did not respond. Defendant then texted, "I'll be good." The victim responded, "Okay, in a bit." Defendant wrote, "When's a good time for you, [J.L]?" She testified that she was trying to put off Defendant and texted him back, "I'll tell you." The victim next received a text stating, "If you're scared, say you're scared, I understand." She was not sure who sent the text. At 4:50 a.m., Defendant texted the victim and said, "Okay, gorgeous" with a "smiley-face" symbol. He then wrote, "I wish I could have dance [sic] with ya [sic] before you left." The victim responded, "Ha ha, I was too drunks [sic]." Defendant texted, "Let me take care of you. And dance with me." The victim did not respond. He then texted, "LOL, night, [J.L.]. Call me tomorrow." Again, the victim did not respond.

The victim testified that she called Mr. Berry, and they had two conversations lasting four and seven minutes. Defendant sent her several additional messages while the

3

victim continued texting Mr. Berry. Defendant called the victim again at 5:39 a.m., and she did not answer. She continued exchanging texts with Mr. Berry. At 5:40 a.m., the victim's phone records reflect an incoming call from Defendant lasting three seconds. The victim did not recall speaking with Defendant. At 5:41 a.m., Defendant sent the victim a text asking where she lived, and she received a missed call from Defendant within one minute. The victim then received a text stating, "You suck, sweet dreams. Call me if you ever want to go out and have a drink or dinner." At 5:46 a.m., Defendant texted the victim stating, "[W]ake up, darling."

The victim said that she was very drunk and went to bed. She was wearing a bra, underwear, shorts, and a camisole when she went to bed. The next thing that she remembered was seeing Defendant's shadow in the doorway of her bedroom. She then vomited in a bag that was on her floor, and Defendant handed a bottle of water to her. The victim testified that she passed out and then awoke to the "weight" of Defendant's body on hers. She passed out again and "came to when he was engaging in oral sex with [her]." The victim specifically testified that Defendant's mouth and tongue were on her vagina. She testified: "I remember during the oral sex part, me kind of turning to my side and like half asleep moaning like, no, stop. But no. Moaning no. But I was - - I wasn't really with it." She did not remember removing her clothing. She only "faintly" recalled Defendant "grappling" with her bra strap. When asked if she called out to her roommates, the victim testified:

> I was passed out for I assume ninety percent of it. I was not awake and I would kind of come up and wake up but not really be there. Enough to kind of get what was going on but not to fully understand the gravity of the situation and even have the ability to move and get up and get out of it.

The victim testified that her contact with Defendant was not consensual, and she did not give him her phone number for the purpose of inviting him to her house. She never gave Defendant her address. Concerning the text messages, the victim testified:

> He was texting me and I was just very not [sic] interested. He was texting me a lot. And I was just trying to be polite because he works downtown and I'm going to have to see him. He's a mutual friend. I can't be like stop texting me, you're freaking me out. And so I just kind of giving him the blow off, like I'll talk to you later, I'll see you later, full well knowing I had no intention of wanting to see him.

The victim testified that when she woke up the morning after the rape, she did not know the whereabouts of her phone. She had her roommate, Ms. Daniels, call it at 10:52

4

a.m. so that she could find it. The victim asked Ms. Barnes if anyone had come into the house that night. She learned that Defendant came over. The victim called Officer Sammie Wicks to ask if he had given Defendant her address, and Officer Wicks indicated that he had not given it to Defendant. The victim testified that she was mostly concerned with how Defendant got her address and came into her house. Officer Wicks arrived at the victim's house and then called to report the rape. Other officers arrived at approximately 11:00 a.m. The victim recalled talking to seven or eight law enforcement officers that morning and afternoon about what had happened. The victim was taken for a sexual assault examination, and she provided a statement at the police station. The victim returned to the station a day or two later with her lawyer to make one correction to her statement and to add some information that had been omitted. She noted that the officer had written the word "annually" when she told him "anally." The victim also told the officer that she did not know if Defendant was circumcised, but the officer had written that the victim told him Defendant was not circumcised. The victim did not sign the statement the day that it was made.

Leah Barnes testified that when the victim arrived home on January 20, 2013, she was "staggering" down the hallway, threw her purse down, used the restroom, and then talked with her roommates. Ms. Barnes testified that the victim was obviously very intoxicated and slurring her words. Ms. Barnes received a call from a friend at approximately 6:00 a.m. on January 20, 2013, asking Ms. Barnes to open the front door because the friend was coming to visit another roommate. After Mr. Barnes went back to bed, she heard a knock on the front door. She looked through the peephole and saw a man that she vaguely recognized standing outside the door. Ms. Barnes opened the door and recognized Defendant, whom she knew as a police officer. Defendant asked for the victim, and Ms. Barnes told him that she would see if the victim was awake. Defendant waited inside the door while Ms. Barnes checked on the victim.

Ms. Barnes testified that the victim was in her bedroom asleep with the lights off. Ms. Barnes told the victim that she had a visitor, to which the victim replied, "What?" Ms. Barnes repeated herself, and the victim still did not understand her. Ms. Barnes told the victim a third time that she had a visitor, and the victim said, "You're dumb," and she giggled. Ms. Barnes then asked the victim if she wanted her to tell Defendant to leave, and the victim said, "Yeah, no, okay." Ms. Barnes told the victim that she did not know what the victim meant, but the victim did not respond. Ms. Barnes walked back to the front door and told Defendant that the victim was "basically passed out," and that she did not know what he wanted her to do. Defendant responded, "Are you serious," in a perturbed tone. Defendant then indicated that he had just gotten off the phone with the victim. Ms. Barnes again told Defendant that the victim was passed out. He responded, "Alright, whatever," and walked back toward the door. Ms. Barnes went back to her room and shut the door. Although she did not see Defendant actually leave the house,

5

she trusted that he did so because he was a police officer. Ms. Barnes testified that she went back to bed but she did not immediately fall asleep. She heard someone open a cabinet in the kitchen, but did not get up to see who it was because there were several others in the house at the time. A few minutes later, Ms. Barnes got up to lock the front door, and she did not see anyone in the house.

Sean Berry, the victim's boyfriend, testified that he worked at Silky O'Sullivan's as a bartender. On January 20, 2013, Mr. Berry stopped by the victim's house after leaving work to check on the victim before he went home. The victim had told him earlier that she had been drinking and was going out with friends. Mr. Berry arrived at the house at approximately 4:00 a.m. with some food from McDonald's for the victim to eat. He said that the victim seemed intoxicated at the time but she was coherent. Mr. Berry testified that he refused to spend the night with the victim because he worked Thursday through Sunday, and he needed every hour of sleep that he could get. It was his practice not to spend the night with her on those nights. Mr. Berry said that the victim got upset because he refused to spend the night with her, and she slapped him. He then removed the victim's house key from his key ring and placed it on the floor. He also told the victim that they would talk when she was sober. Mr. Berry testified that the victim texted him a few times after he left, but he did not return to the house. He said that the victim called him later that morning. He knew that something had happened, and the victim wanted him to be with her. However, Mr. Berry testified that he did not go see the victim because he was going out of town the following night. Mr. Berry testified that the victim told him that she had woken up and someone was on top of her. He said that she did not initially know who it was. Within a couple of days, the victim told him who she thought it had been.

Officer Sammie Wicks of the Memphis Police Department testified that he attended Rhodes College with the victim, and they are friends. He also went through the police academy with Defendant, and they were also friends. Officer Wicks testified that he had introduced the victim and Defendant to each other. On January 20, 2013, the victim called Officer Wicks and told him that Defendant had raped her. He said that the victim was very upset and needed to be calmed down. Officer Wicks testified that he initially called a fellow police officer to ask for advice. He then called the police dispatcher and requested that an officer be sent to the victim's house. Officer Wicks also went to the victim's house and arrived approximately ten minutes before other officers arrived. He said that the victim was upset and crying. The officers asked the victim and Officer Wicks questions about what happened. Officer Wicks remained with the victim for most of the day. He testified that the victim told him that she sent Defendant a text telling him to come over. However, she had not meant to send it to Defendant.

6

Glenda Moses, a forensic nurse at the Rape Crisis Center, examined the victim the day after the rape. The victim reported to her that the victim had gone out with friends and drank several shots, vodka drinks, and beer. She provided Ms. Moses with an account of the events leading up to the rape which was consistent with the victim's trial testimony. The victim told Ms. Moses that Defendant performed oral sex upon her, penetrated her vaginally with his penis, and that her anal area was sore. Dr. Moses performed a physical examination on the victim and observed a skin tear and some redness of the victim's anal area. Dr. Moses confirmed that the injuries could have been caused by anal penetration. She did not find any injuries to the victim's vaginal area. Dr. Moses explained that it is common not to find vaginal injuries after a victim suffers a sexual assault because vaginal tissues stretch.

Sergeant Melvin Amerson of the Memphis Police Department, Sex Crimes Unit, was the lead investigator in the victim's case. He took a statement from the victim, and he and Sergeant Burton spoke with Defendant. Sergeant Amerson testified that although Defendant was a police officer, Sergeant Amerson did not know him. Defendant waived his rights and provided a statement. He admitted that he used the Warrant Apprehension Solution Program (WASP) to locate the victim's address and that he had sexual contact with the victim. Defendant told Sergeant Amerson that the victim invited him to her house and that her roommate let him inside. He walked to the victim's bedroom and discovered that she was intoxicated. Defendant said that the victim vomited, and he then gave her water and rubbed her back. He claimed that he asked the victim if she wanted him to leave, and she said no. Defendant told Sergeant Amerson that he and the victim began kissing, and they removed their clothing. Defendant admitted that he had oral sex with the victim, and he attempted to have vaginal intercourse with her, but he could not maintain an erection. He further admitted to inserting the tip of his finger into the victim's anus. Defendant told Sergeant Amerson that he continued to have oral sex on the victim in order to arouse himself, but she fell asleep so he stopped. He said that he lay down beside the victim and tried to get an erection because he wanted to have sex with her. Defendant admitted that he again attempted to vaginally penetrate the victim but he could not maintain an erection. He then got dressed and attempted to give the victim some more water, but she was passed out. Defendant said that he was embarrassed by his inability to maintain an erection, and he left.

Defendant denied to Sergeant Amerson that he forcibly raped the victim, and he said that the victim never said "no." He noted that he did not wear a condom during the incident, and he did not ejaculate. Defendant thought that the entire incident lasted approximately twenty minutes. He told Sergeant Amerson that the victim had made the comment earlier that she wanted to "f--k a police officer." When Defendant told the victim that he was jealous, he claimed that she said, "Well, we can f--k."

7

Sergeant Roosevelt Twilley, of the Memphis Police Department, Sex Crimes Unit Internet Crimes Against Children, testified that he works as a certified forensic examiner of cellular phones and computers. His testimony revealed that between 3:51 a.m. and 6:00 a.m. on January 20, 2013, there were approximately fifty text messages exchanged between the victim and Defendant. Sergeant Twilley testified that there were three telephone calls, with one lasting three seconds and the others not showing a connection.

William Downen, Chief Inspector of information technologies for the Shelby County Sheriff's Office, testified that he administers the WASP Program which provides a database to assist with the resolution of arrest warrants. Inspector Downen testified that WASP provides access to databases for local utilities, motor vehicle registration, driver's licenses, and other record management databases. He said that police officers may apply for access to the system for investigative purposes. Inspector Downen noted that the login page contains a legal notice advising of acceptable uses of the database. He teaches new police recruits that they are not permitted to use the system for personal purposes. Inspector Downen testified that Defendant queried the victim's name at 6:00 a.m. on the morning of the rape. Defendant also queried the "Visions" records management system at 8:11 a.m. and 8:12 a.m. on the morning following the rape and pulled two crime incident reports filed by the victim.

**Analysis**

*I.      Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support his rape convictions in Counts 1 and 2. He argues that he reasonably believed the victim consented to the sexual encounter, and he was unaware that she was physically incapacitated.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of witnesses and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d. 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

8

"[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Rape is the unlawful sexual penetration of a victim by the defendant accomplished by force or coercion, without the consent of the victim, and the defendant knows or has reason to know at the time of the penetration that the victim did not consent, *or* where the defendant knows or had reason to know that the victim is mentally incapacitated or physically helpless. T.C.A. § 39-13-503(a)(2)-(3). "Sexual penetration" includes sexual intercourse, cunnilingus, anal intercourse, or any other intrusion, however slight, of any part of a person's body into the genital or anal openings of the victim's body. T.C.A. § 39-13-501(7).

Viewing the evidence in a light most favorable to the State, the proof shows that the victim did not consent to the sexual contact in this case (Count 1), and Defendant knew that she was mentally incapacitated or physically helpless during the attack (Count 2). There is no question that the victim was intoxicated during the early morning hours of January 20, 2013, and that she and Defendant exchanged several text messages, some of which she could not remember. The victim acknowledged that she sent Defendant a text message that read, "[C]ome here;" however, she testified that the message was meant for her boyfriend whom she had argued with earlier because she wanted him to stay at her house, and he refused. The victim also responded "okay" when Defendant asked if they could hang out, but she did not respond when he asked when. Defendant also texted, "You want me to come over?" The victim responded, "ha, ha later." Defendant next texted the victim and said, "[L]et's hang out." The victim did not respond. Defendant then texted, "I'll be good." The victim responded, "Okay, in a bit." Defendant wrote, "When's a good time for you, [J.L]?" She testified that she was trying to put off Defendant and texted him back, "I'll tell you." The victim did not respond to Defendant's requests for her address and only told him that she lived in the "Cooper Young" area. Defendant then improperly used his access to the WASP system through the Memphis Police Department to look up the victim's address and show up at her house asking to see her.

The victim's roommate, Ms. Barnes, testified that the victim was obviously very intoxicated and slurring her words on January 20, 2013. She said that the victim was in her bedroom asleep with the lights off when Defendant showed up. Ms. Barnes told Defendant that the victim was "basically passed out," and that she did not know what he wanted her to do. Defendant responded, "Are you serious," in a perturbed tone. Defendant then indicated that he had just gotten off the phone with the victim. Ms. Barnes again told Defendant that the victim was passed out. He responded, "Alright, whatever," and walked back toward the door. Ms. Barnes went back to her room and

9

assumed Defendant left because she trusted him as a police officer. However, Defendant did not leave and went into the victim's bedroom.

The victim testified and Defendant acknowledged that the victim vomited as soon as he walked into her bedroom. The victim passed out after that and awoke to the weight of Defendant's body on top of her. She testified that when she went to sleep she was wearing a bra, underwear, shorts, and a camisole. She did not recall removing her clothes, although she vaguely recalled Defendant grappling with her bra strap. When Defendant began having oral sex with the victim, she moaned, "No, stop." Defendant also tried to have intercourse with the victim but he could not maintain an erection. In his statement to police, Defendant acknowledged that the victim passed out while he was having oral sex with her. He then lay beside her while she was passed out and continued to try and achieve an erection for the purpose of having sex with her. Defendant again penetrated the victim vaginally but stopped because he could not maintain an erection. Defendant admitted in his statement that he also penetrated the victim's anus with his finger, and Glenda Moses testified that the victim's examination after the rape showed a skin tear and some redness of the victim's anal area. The victim testified that her contact with Defendant was not consensual, and she did not give him her phone number for the purpose of inviting him to her house, and she never gave Defendant her address.

The victim testified that she went in and out of consciousness during the rape and that she did not call for help because she was too intoxicated to fully understand the situation. Defendant acknowledged in his statement that the victim was passed out when he left her.

The jury obviously accredited the victim's testimony that she was physically incapacitated during most of the encounter with Defendant due to her intoxication and that she did not consent to sexual contact with him. Based upon the evidence presented, a rational jury could find Defendant guilty of both counts of rape beyond a reasonable doubt. Defendant is not entitled to relief as to this issue.

II.     *Sentencing*

Defendant contends that the trial court erred by imposing a sentence that was only one year below the maximum sentence for his merged rape convictions. The State responds that the sentence was supported by the proof and "was determined in accordance with the applicable sentencing principles." We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning were improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement and mitigating factors are *advisory only*. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select *any sentence within the applicable range* so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act]." *Id.* at 343 (emphasis added). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

In *Bise*, our supreme court held:

> We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court *wholly departed* from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*, 380 S.W.3d at 706 (emphasis added). In its conclusion, the supreme court pointed out that in sentences involving misapplication of enhancement factors (even in those cases where no enhancement factor actually applies) the sentences must still be affirmed if the sentences imposed are within the appropriate range, and the sentences are in compliance with statutory sentencing purposes and principles. *Id.* at 710.

Our General Assembly has enacted twenty-five (25) statutory sentencing enhancement factors; however, they are not binding upon the trial courts. T.C.A. § 40-35-114 (Supp. 2015). As previously noted, the weighing of mitigating and enhancement factors is left to the trial court's discretion, *Carter*, 254 S.W.3d at 345, and in fact the trial court's weighing of enhancement or mitigating factors is not a ground for appellate relief. *Id.*; T.C.A. § 40-35-401(b). The standard of review established in *Bise* provides that the minimum sentence can be imposed even if the trial court correctly applies all twenty-five enhancement factors, or conversely the maximum sentence can be imposed even if no

11

statutory enhancement factors are applicable, so long as the sentence is within the correct range and the sentence complies with the sentencing purposes and principles. Accordingly, appellate review of enhancement factor issues is arguably superfluous when reviewing the length of a sentence.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. T.C.A. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.

The applicable sentencing range for a Range I offender convicted of a Class B felony is 8 to 12 years. T.C.A. § 40-35-112(a)(1)-(2). The trial court explained in detail the factors that it considered in sentencing Defendant. With regard to Count 1, the trial court found as an enhancement factor that the victim was particularly vulnerable due to physical or mental disability. T.C.A. § 40-35-115(4). The trial court cited to several cases holding that a victim is "particularly vulnerable when his or her ability to summon assistance is impaired," and a defendant took "advantage of one or more of these conditions in the commission of the crime." *State v. Butler*, 900 S.W.2d 305, 313 (Tenn. Crim. App. 1994); *State v. Poole*, 945 S.W.2d 93, 97 (Tenn. 1997); *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001). The trial court placed "pretty good" weight upon Factor 4 finding that Defendant had seized upon the victim's intoxication to rape her. The trial court further stated: "[Defendant] accelerated his efforts because he wanted to make sure that he could get to her while she was intoxicated, not the next day when she was sober." The record supports the trial court's findings.

12

The trial court also found as an enhancing factor that Defendant had abused a position of public trust. T.C.A. § 40-35-115(14). The trial court noted that Defendant was a police officer in the area where the victim worked, and his job was to keep the public safe. The trial court also pointed out that Defendant abused his access to a police database to look up the victim's address and show up at her house. Defendant admitted to his conduct. Also, the victim's roommate recognized him as a police officer and let him into the house. She also trusted that Defendant would leave when she told him that the victim was in her bedroom passed out. Again, the record supports the trial court's findings.

The trial court found one mitigating factor, that Defendant's conduct neither caused not threatened serious bodily injury. T.C.A. § 40-35-113(1).

Because the trial court properly considered the evidence offered by the parties, stated on the record what enhancement and mitigating factors were considered, and complied with the purposes and principles of sentencing and imposed a within range sentence, the trial court did not abuse its discretion in enhancing Defendant's sentence. Defendant is not entitled to relief.

Accordingly, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

13